UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALEXANDER R. CIFUENTES,

     Plaintiff,

v.                                                                       Case No: 6:25-cv-1651-JSS-LHP

SID TOOL CO., INC.,

     Defendant.

_____/

## **ORDER**

In this employment discrimination case, Defendant moves for partial dismissal of the second amended complaint (Dkt. 43) pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 51.) Specifically, Defendant moves to dismiss seven counts from the thirteen-count pleading and requests dismissal without leave to amend. (*Id.*) Plaintiff, proceeding pro se, opposes the motion. (Dkt. 59.) Upon consideration, for the reasons outlined below, the court grants the motion in part and denies it in part. The court dismisses the challenged counts without prejudice and permits Plaintiff to file a third amended complaint.

## **FACTS**[1]

This case arises out of Defendant's allegedly "discriminatory and retaliatory discipline and termination" of Plaintiff. (Dkt. 43 at 1.) Plaintiff claims that Defendant

---

[1] The court derives the facts from the second amended complaint (Dkt. 43). *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).

discriminated against him because of his "Hispanic and Middle Eastern ancestry" and his "lifelong neurodevelopmental and anxiety-related disabilities, including [attention-deficit / hyperactivity disorder (ADHD)] and [a]utism / Asperger's spectrum traits." (*Id.* at 20.) According to Plaintiff, Defendant also retaliated against him for reporting and opposing such discrimination and for requesting disability accommodations in the form of "written instructions, written process documentation, and structured communication" and "written participation and scheduling modifications tailored to [his] processing limitations." (*Id.* at 20–21, 23.) In support of these claims, the second amended complaint contains numerous allegations relating to Plaintiff's employment with Defendant. (*See id. passim.*) The court does not relate all the allegations but summarizes the pertinent facts herein. That said, in ruling on the instant motion, the court has considered the entire second amended complaint.

In October 2022, Defendant—a national distributor in the metalworking and maintenance, repair, and operations markets—interviewed and ultimately hired Plaintiff for the position of outside sales account executive in Orlando, Florida. (*Id.* at 3–4.) The position entailed "developing and managing customer accounts through on-site visits, product consultation, quotation support, order coordination, and customer service" and, after ten weeks of paid onboarding and training, "was primarily commission-based." (*Id.* at 4.) During the job interview, weeks before Plaintiff's employment began, Defendant required him to execute confidentiality and non-competition agreements. (*Id.*) Plaintiff reports that he "did not receive a fully executed copy of the . . . agreements and was not provided a version signed by a current

authorized human resources [(HR)] representative." (*Id.*) Plaintiff also states: "The onboarding documents contained inconsistent subsidiary names, outdated form versions, and HR signatures predating Plaintiff's interview or employment." (*Id.*) On Plaintiff's start date, Defendant assigned him "approximately fifty accounts across multiple counties in Central Florida." (*Id.* at 6.) However, "[w]ithin approximately seven months," Defendant more than tripled the number of accounts assigned to Plaintiff. (*Id.*) Plaintiff claims that despite his expanded territory, Defendant failed to "upgrade [his] data servicing" and thereby "compromised [his] communication." (*Id.*) Nevertheless, "[b]etween December 2022 and April 2023, Plaintiff received multiple written performance commendations . . . documenting successful customer interactions, follow-through, and problem resolution." (*Id.* at 8.)

In November 2022, Plaintiff purportedly discovered "that Defendant did not maintain any written process documentation for core sales and operational functions and that procedures were considered proprietary and learned through hands-on training." (*Id.* at 5 (quotation omitted).) In response, Plaintiff asked training personnel for "written notes or . . . instructions . . . due to [his] processing limitations," but this request was denied. (*Id.*) Plaintiff also asked his direct supervisor, Jay Gillespie, for "written instructions and . . . process aids." (*Id.*) Gillespie reportedly declined the request, stated that he was "an important person," and remarked: "[P]lease do not waste my time." (*Id.*) Plaintiff claims that after he made these requests for disability accommodation, he "experienced increased scrutiny including performance criticisms

and disciplinary pressure." (*Id.*)  Beginning the same month, Plaintiff states, he was "assigned to perform approximately twenty hours per week of [v]endor-[m]anaged [i]nventory (VMI) labor, which is typically compensated as a separate hourly position." (*Id.* at 6 (quotation omitted).)  This labor was additional to Plaintiff's sales duties and "included unloading products, stocking bins, conducting counts and audits, cleaning, organizing inventory, and performing physical replenishment."  (*Id.*) Plaintiff claims that "VMI labor was not listed in [his] job description, [was] not discussed during interviewing, and was not compensated separately," as through bonuses or hourly payments. (*Id.*)  Plaintiff reports that he "worked more than sixty hours per week due to combined sales, administrative, travel, and VMI obligations." (*Id.*)

GFL Environmental was one of the customers assigned to Plaintiff.  (*Id.* at 4.) Prior to his start date, Plaintiff was purportedly told that GFL was "a difficult account" that "disputed orders" and "required careful handling," as it often did not know what it wanted or needed. (*Id.*)  Beginning November 2022, Defendant required Plaintiff to collaborate with Daniel Pierce, a maintenance supervisor for GFL in the Orange City territory. (*Id.* at 6.)  The goal of this collaboration was to "inventory and categorize hundreds of fittings in GFL's possession that had not originally been sold by Defendant." (*Id.*)  Allegedly, Pierce "repeatedly asked Plaintiff[,] '[W]here are you from?', mispronounced Plaintiff's surname, and substituted alternate names despite Plaintiff requesting to be called Alex," whereas "Pierce addressed non-Hispanic personnel by their first names." (*Id.* at 7.)  According to Plaintiff, Pierce also

"repeatedly spoke negatively about" Plaintiff's African-American predecessor, calling him "incompetent" and asserting that he had "provided poor customer service" even though he had worked for Defendant "for more than eight years" and, in Plaintiff's estimation, was "extremely professional." (*Id.*)  Additionally, Pierce called his own manager a nickname to "mock[] his short stature." (*Id.* at 8.)  Plaintiff also heard from a coworker that overall, personnel on site "routinely made derogatory remarks about women in sexual and other demeaning terms." (*Id.* at 7.)  Plaintiff generally asserts that the "conduct occurred weekly or biweekly for several months" on site and during telephone calls with Pierce. (*Id.*)

In early 2023, Plaintiff emailed Gillespie to report that the Orange City territory "had become unmanageable due to excessive travel, lack of hotel reimbursement, late appointment windows, and unpaid VMI obligations." (*Id.*)  Despite the email, Plaintiff's situation did not change. (*Id.* at 8.)  Plaintiff notes that the Orange City site where he worked lacked ventilation such that "[d]uring multiple visits, the temperature caused Plaintiff to sweat through his clothing and [to experience] headaches and physical exhaustion, requiring [him] to wait before driving home due to fatigue." (*Id.*)  According to Plaintiff, Defendant continued assigning him to the site despite these conditions. (*Id.*)

As to his job performance, Plaintiff represents that in February 2023, his "account activity generated approximately $60,000 on average per month in revenue and was tracking toward approximately $800,000 in annual sales for 2023." (*Id.*)  Plaintiff relatedly reports having "received over [twenty] written commendations from

coworkers, supervisors, national account managers, customer service [representatives], and part specialists" regarding his "performance and customer service." (*Id.*)  In addition, Plaintiff describes a February 2023 incident involving a high-volume customer that threatened to stop buying from Defendant in light of fulfillment failures.  (*Id.* at 8–9.)  With assistance, Plaintiff was able to retain the customer's business for Defendant.  (*Id.*)

On March 14, 2023, Pierce reportedly "contacted Plaintiff after hours and requested a small rush order valued at approximately $69."  (*Id.* at 10.)  Plaintiff "attempted to input the order" but was delayed due to a documented computer glitch. (*Id.*)  On March 16, 2023, Plaintiff learned that Pierce was escalating complaints about the delayed order and blaming Plaintiff.  (*Id.*)  Pierce allegedly asked that Plaintiff be terminated in connection with the order.  (*Id.*)  Despite the glitch, Defendant faulted Plaintiff for the incident, and when Plaintiff sent emails attaching an alert about the glitch, Gillespie threatened Plaintiff's termination because, according to Gillespie, the alert contained Defendant's proprietary information.  (*Id.* at 10–11.)  Plaintiff states that on March 18, 2023, Pierce "called Plaintiff at his home after hours and spoke in a hostile and aggressive manner, huffing in anger and raising his voice while demanding that Plaintiff accept blame."  (*Id.* at 11.)  Plaintiff informed Gillespie about Pierce's conduct, including the call, suspected racial profiling, past name-calling, and other problems that caused Plaintiff to feel unsafe working with Pierce.  (*Id.*)  Gillespie responded by visiting Pierce at work to evaluate him.  (*Id.*)  Afterwards, Plaintiff

claims, Gillespie described himself as "a good judge of character" to Plaintiff and advised that he had fixed the problem and that Pierce was not racist. (*Id.*)

In April 2023, Gillespie informed Plaintiff during a telephone call that moving forward, Plaintiff "would be the sole contact" on site with Pierce because a coworker had been reassigned. (*Id.* at 12.) Plaintiff responded that he did not feel safe returning to the site, and Gillespie replied: "Alex, you are going up there!" (*Id.*) After Plaintiff spoke with Defendant's HR department, Defendant temporarily removed Plaintiff from servicing the GFL facility where Pierce worked, but Defendant still required Plaintiff to "do business at other sites with the same upper facilities' management." (*Id.*) Plaintiff states: "Defendant did not reduce [his] exposure to GFL after [he] raised concerns regarding racial profiling, harassment, and safety at GFL facilities." (*Id.*) Reportedly, throughout April 2023, Pierce's supervisor "screamed at Plaintiff" not to "mess up . . . orders" and refused to cooperate with Plaintiff. (*Id.* at 12–13.) Further, between February and April 2023, a different GFL maintenance supervisor caused multiple problems for Plaintiff. (*Id.* at 13.) For example, he told Plaintiff to proceed with expensive fittings but later became upset with the price and described Plaintiff as incompetent to a senior VMI specialist. (*Id.*) He also refused to provide Plaintiff with a purchase order concerning "two large orders for screws and fittings." (*Id.*)

On April 17, 2023, "during a [Microsoft] Teams meeting after working hours," a representative from Defendant's HR department "contacted Plaintiff regarding the GFL escalation." (*Id.*) Plaintiff reports that "[a]t the time, [he] was working in excess of sixty hours per week and was assisting his disabled mother with hospice care for his

grandmother." (*Id.*)  The HR representative "ask[ed] the same questions multiple times, in different ways, to test consistency," even though she knew that Plaintiff "had difficulty processing and responding due to exhaustion and processing limitations." (*Id.*)  Plaintiff had furnished a written timeline of events, but the HR representative had not reviewed it.  (*Id.*)  After she "instructed Plaintiff to provide brief one-line responses for her notes" because "she needed to conclude the session," Plaintiff told her that "he was experiencing exhaustion and needed to continue hospice duties." (*Id.*)  She purportedly responded that "continuing the HR discussion was more important than 'dealing with a dying family member.'" (*Id.*)  According to Plaintiff, his mother "overheard the entire call." (*Id.*)  Although Plaintiff was eligible for FMLA leave, he indicated that he did not want to take FMLA leave because doing so would "result[] in lost commissions and customer relationships" and "would financially disadvantage him and harm his performance metrics." (*Id.* at 13–14.)  Plaintiff alleges that overall, the HR representative "conducted a structured adversarial HR interrogation designed to provoke, fatigue, and discredit Plaintiff, while discouraging FMLA leave, suppressing timeline documentation, and manufacturing a disciplinary narrative of 'aggression' and 'insubordination' to support [his] termination." (*Id.* at 14.)

During an April 28, 2023 Microsoft Teams meeting attended by Plaintiff, Gillespie, and Gillespie's supervisor, whom Plaintiff identifies only as Martz, Defendant issued Plaintiff a corrective action notice (CAN) and a performance improvement plan (PIP).  (*Id.*)  Plaintiff was expecting a six-month performance

review and accordingly was not expecting to receive such formal discipline at the meeting. (*Id.*) The CAN focused on Plaintiff's inquiries into Defendant's unwritten procedures, the February 2023 incident involving the high-volume customer, and an unspecified statement that unidentified administrative staff had made to Gillespie about Plaintiff's workplace interactions. (*Id.* at 15.) Allegedly, although Plaintiff was achieving his sales goals, Defendant claimed to be more focused on perceived interpersonal deficiencies. (*Id.*) Plaintiff states that the CAN required him to "perform five daily customer visits, five daily processed orders, [and] five daily Salesforce entries" and to increase sales prospecting, and it did not "allow[] time for order entry, unpaid VMI assignments, fixing [computer] problems with every order[,] and addressing problems related to a broken sales process." (*Id.*) The CAN also required Plaintiff to "participate in mentoring and emotional intelligence training" and to "complete 'remote Salesforce training,' which Plaintiff later learned did not exist." (*Id.*) Plaintiff indicated that he could not satisfy the CAN requirements given his VMI obligations and the large size of his territory, but Defendant did not alter the requirements. (*Id.* at 16.) At the end of the meeting, Martz told Plaintiff that "Plaintiff reminded him of himself when he was younger" and that "he had been a 'young, dumb jerk'" who "needed to be fired . . . to learn how to treat people." (*Id.*) According to the second amended complaint, "[b]ased on Martz's statements, Plaintiff reasonably believed that termination was being framed as a disciplinary lesson rather than a corrective process." (*Id.*) The day after the meeting, Plaintiff purportedly "issued a written rebuttal explaining that discipline following reports of racial profiling and

hostile treatment constituted retaliation." (*Id.*)

Defendant set a probationary period of May to June 2023 for Plaintiff. (*Id.*) On May 2, 2023, Plaintiff contracted a contagious gastrointestinal virus and was consequently isolated in his home. (*Id.*) He "obtained medical documentation" concerning his illness and "continued contacting customers and processing orders" in isolation. (*Id.*) He reportedly "did not request sick leave other than for customer visits." (*Id.*) According to Plaintiff, although he had advised management of his illness and isolation, Martz "questioned why [he] had not begun working on [the] requirements" discussed during the April 28, 2023 meeting. (*Id.* at 17.) Between May 5 and 23, 2023, Plaintiff "attended required mentoring sessions with Martz." (*Id.*) On May 10, 2023, Martz allegedly "compared Plaintiff to his wife learning to drive a manual transmission" and commented that "she was initially 'unconsciously incompetent' before becoming 'consciously competent.'" (*Id.*) Martz qualified this comment: "I'm not saying you're incompetent[. T]hat's just the story." (*Id.*) Plaintiff states that the "additional mentoring sessions required [him] to work weekends." (*Id.*) Plaintiff further states: "During mentoring sessions, Martz reviewed Plaintiff's emails and questioned email length and formatting despite Plaintiff explaining that detailed written emails were required for accommodation purposes to ensure accuracy and protect against escalation." (*Id.*) Purportedly, Martz faulted Plaintiff for formatting mistakes that appeared in Plaintiff's emails, even though unresolved errors in Defendant's computer system were in fact to blame. (*Id.*) In mid-May 2023, Martz

criticized Plaintiff for providing a customer with a choice of dates for a visit because this practice focused on Plaintiff's, rather than the customer's, needs. (*Id.* at 17–18.) However, the customer "expressed satisfaction with Plaintiff's service" and "placed an approximately $2,000 order with Plaintiff." (*Id.*)

On May 16, 2023, Plaintiff visited a GFL facility in Tavares, Florida, to talk to the team there and to evaluate inventory needs. (*Id.* at 18.) Allegedly, although Plaintiff "confirmed an appointment three times," no GFL employees "were present to receive him," and indeed, "the site supervisor that was supposed to meet [him] left exactly when Plaintiff arrived at the facility." (*Id.*) Plaintiff describes the poor conditions at the facility:

> Upon entering the facility, Plaintiff observed severe vermin infestation and waste contamination on bins and surrounding surfaces in the area proposed for [Defendant's] inventory equipment, including thick accumulations of rodent droppings, spider webs, dead flies, and live spiders. The contaminated conditions extended to the physical parts inventory. Plaintiff was required to handle and process inventory orders while hazardous waste, dead insects, and vermin droppings were present on or around the parts. Plaintiff was not provided with personal protective equipment and was expected to complete order processing despite the contamination. During the visit, Plaintiff worked in unventilated warehouse spaces and experienced heat-related symptoms including profuse sweating, headaches, and physical fatigue.

(*Id.* (reformatted from numbered paragraphs).) Plaintiff complained about these conditions, and eventually, Pierce's supervisor contacted Defendant's management about Plaintiff. (*Id.* at 18–19.) Plaintiff alleges that a representative from Defendant's HR department told Plaintiff that Plaintiff should have personal protective equipment for cleaning; however, Plaintiff was not "provided such equipment, a process, or

assigned cleaning tasks for any customer." (*Id.* at 18.)  Plaintiff also alleges: "During a mentoring session that same day, Martz stated that Plaintiff was 'missing an opportunity to sell them soap.'" (*Id.*)  Ultimately, GFL refused to clean the facility. (*Id.* at 19.)  On May 23, 2023, Defendant informed Plaintiff that it had protected him from GFL.  (*Id.*)

On May 25, 2023, Defendant terminated Plaintiff's employment, basing the termination on behavior by Plaintiff that Defendant described as aggressive.  (*Id.*)  Plaintiff notes that he serviced more than one hundred customers, none of which described him as aggressive except for GFL. (*Id.*)  Defendant later advised the United States Equal Employment Opportunity Commission (EEOC) that Plaintiff was terminated because he focused inordinately on himself and demonstrated hostility and because Pierce's supervisor complained about Plaintiff's servicing of GFL's Tavares and Orlando facilities.  (*Id.*)  Defendant did not mention the Orange City site.  (*Id.*)  According to Plaintiff, "Defendant did not offer reassignment, modified duties, FMLA leave, or accommodation prior to termination," and "Plaintiff lost his bonus for May 2023 due to [his] termination date."  (*Id.*)  Further, Defendant asserted the enforceability of Plaintiff's non-competition agreement, and as a result, Plaintiff "reasonably believed that the . . . agreement restricted [his] employment opportunities in the industrial supply sector."  (*Id.* at 19–20.)  Plaintiff states that in July 2023, he "reported discrimination, retaliation, hostile work environment, disability-related concerns, and termination circumstances" to the EEOC.  (*Id.* at 20.)  After nearly two

years, the EEOC issued Plaintiff a right-to-sue letter.  (*Id.*; *see* Dkt. 43-1.)

Twice in the second amended complaint, Plaintiff compares himself to David Lynch, an account executive for Defendant.  (Dkt. 43 at 16–17.)  First, when Defendant issued the CAN and PIP to Plaintiff, Plaintiff reportedly "advised management that no other [a]ccount [e]xecutive in the district was required to perform the same metrics and that . . . Lynch did not use Salesforce for those metrics." (*Id.* at 16.)  Plaintiff alleges: "Martz responded, 'Well[,] he will be doing it now,' and Gillespie told Plaintiff, 'Don't compare yourself to Lynch when he's doing better than you.'" (*Id.*)  Plaintiff further alleges: "Previously, Lynch advised Plaintiff that he 'turns off his phone [at 5 P.M.] or he will go crazy.'" (*Id.*)  Second, when Plaintiff was ill and Martz asked him about the requirements discussed during the April 28, 2023 meeting, Plaintiff referenced Lynch's history with the coronavirus.  (*Id.* at 17.)  According to Plaintiff, "Lynch reported contracting [the coronavirus] multiple times during his employment, in a period less than [two] years." (*Id.*)  Moreover, "on one occasion[,] Lynch canceled a scheduled meeting with Plaintiff and Gillespie" citing the virus "but was seen working in the field the following day." (*Id.*)  Nevertheless, Gillespie did not reprimand Lynch.  (*Id.*)  The second amended complaint does not appear to contain any information about Lynch's disabilities, if any, or his ancestry, race, or national origin. (*See id. passim*.)

## PROCEDURAL HISTORY

Given the alleged misconduct described above, Plaintiff initiated this case

against MSC Industrial Supply Co. on August 27, 2025. (*See* Dkt. 1.) The initial complaint asserted six counts: race and national origin discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17 (count one), disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213 (count two), related violations of the Florida Civil Rights Act (FCRA), Fla. Stat. §§ 760.01–760.11, 509.092 (count three), interference and retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654 (count four), wage violations under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (count five), and race and national origin discrimination and retaliation under 42 U.S.C. § 1981 (count six). (Dkt. 1 ¶¶ 59–89.) Plaintiff subsequently filed a notice regarding Defendant's name (Dkt. 13), which the court liberally construed as a motion to amend the complaint by interlineation to name Defendant instead of MSC Industrial as a party to this action. (*See* Dkt. 14.) The granting of the construed motion effectively created an amended complaint. (*See id.*) Defendant moved to dismiss the amended complaint under Rule 12(b)(6) on various grounds including shotgun pleading. (Dkt. 26.) The court granted the motion in part and denied it without prejudice in part. (Dkt. 32.) The court dismissed the amended complaint without prejudice as a shotgun pleading, identified three major pleading deficiencies, and allowed Plaintiff to file a second amended complaint correcting the deficiencies by January 29, 2026. (*Id.*) Plaintiff timely filed the second amended complaint against Defendant. (Dkt. 43.)

The second amended complaint contains thirteen counts. (*Id.* at 22–29.) Counts one and eleven allege race and national origin discrimination under Title VII

- 14 -

and the FCRA.  (*Id.* at 22, 27.)  Counts two and twelve allege a hostile work environment based on race and national origin under Title VII and the FCRA.  (*Id.* at 22–23, 28.)  Count three alleges retaliation under Title VII.  (*Id.* at 23.)  Count four alleges disability discrimination and failure to accommodate under the ADA.  (*Id.* at 23–24.)  Count five alleges retaliation under the ADA.  (*Id.* at 24.)  Count six alleges interference with FMLA rights.  (*Id.* at 24–25.)  Count seven alleges retaliation under the FMLA.  (*Id.* at 25.)  Count eight alleges race discrimination under section 1981.  (*Id.*)  Counts nine and ten seek declaratory judgments as to the enforceability of Plaintiff's non-competition agreement with Defendant and as to Defendant's purportedly discriminatory bases for disciplining and terminating Plaintiff.  (*Id.* at 26–27.)  Count thirteen alleges retaliation under the FCRA.  (*Id.* at 28–29.)  In terms of the relief requested, counts one, three, five, eleven, and thirteen seek "back pay, front pay or reinstatement, compensatory and punitive damages," and legal expenses.  (*Id.* at 22–24, 27, 29.)  Count four seeks the same relief except for punitive damages.  (*Id.* at 24.)  Counts two, eight, and twelve seek compensatory and punitive damages and legal expenses.  (*Id.* at 23, 25, 28.)  Counts six and seven seek back pay, liquidated damages, and legal expenses.  (*Id.* at 25.)  In addition to declaratory relief, counts nine and ten seek "attorney[] fees where authorized," and count nine seeks injunctive relief.  (*Id.* at 26–27.)

The deadline to amend the pleadings in this case expired on February 13, 2026.  (Dkt. 54 at 1.)  The case management and scheduling order advises the parties that

motions to amend a pleading filed after March 5, 2026, are disfavored.  (*Id.* at 2.)

## APPLICABLE STANDARDS

In deciding a motion to dismiss for failure to state a claim, a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff."  *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).  To survive a motion to dismiss, the "factual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 544).  A claim is facially plausible if a plaintiff pleads facts that allow a court to draw a reasonable inference that a defendant is liable for the alleged misconduct.  *Id.*  While "detailed factual allegations" are not generally required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of actions will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Generally, when analyzing a motion to dismiss for failure to state a claim, a court considers only the four corners of the complaint and any attachments thereto.  *See Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023).  Accordingly, "a plaintiff cannot amend [a] complaint through a response to a motion to dismiss."  *Gause v. Med. Bus. Consultants, Inc.*, 424 F. Supp. 3d 1175, 1201 (M.D. Fla. 2019).

Although courts "give liberal construction" to pro se filings, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), pro se parties are still "required . . . to conform to

- 16 -

procedural rules," *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002). *See Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))). The leniency with which courts treat pro se parties does not permit courts to "serve as de facto counsel" or "rewrite an otherwise deficient pleading." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998).

## ANALYSIS

Defendant seeks dismissal of counts two and twelve, count five, counts six and seven, count nine, and count ten. (Dkt. 51 at 7–18.) The court analyzes these counts in turn. As Defendant "has chosen not to move to dismiss" the remaining counts in the second amended complaint, the court does not address those counts. (*Id.* at 2 n.1.)

### A. Counts Two and Twelve

Counts two and twelve allege that Defendant created a hostile work environment for Plaintiff based on his race and national origin. (Dkt. 43 at 22–23, 28.) Although count two proceeds under Title VII and count twelve proceeds under the FCRA, the court examines the counts together because "[c]laims under Title VII and the FCRA are analyzed under the same framework." *Harris v. Pub. Health Tr. of Mia.-Dade Cnty.*, 82 F.4th 1296, 1300 n.2 (11th Cir. 2023); *see Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 & n.1 (11th Cir. 2004) (examining Title VII and FCRA hostile work environment claims together). Plaintiffs asserting such hostile work environment

- 17 -

claims "must establish that [they] suffered unwelcome harassment, that it was based on a protected characteristic, and that it was sufficiently severe or pervasive to alter the terms and conditions of [the plaintiffs'] employment and create an abusive working environment." *Harris*, 82 F.4th at 1302 (quotation omitted).  Defendant contends that the counts fail to state hostile work environment claims because they do not adequately allege any of these elements.  (Dkt. 51 at 7–10.)

Liberally construed in Plaintiff's favor, *see Henley*, 945 F.3d at 1326; *Albra*, 490 F.3d at 829, counts two and twelve center on Pierce's alleged mistreatment of Plaintiff, which seemingly affected Plaintiff's dealings with other GFL employees, and on Defendant's response to the alleged mistreatment, which purportedly resulted in discipline and termination for Plaintiff.  (*See* Dkt. 43.)  The counts plead:

> During Plaintiff's employment, Plaintiff was subjected to unwelcome conduct based on race [and] national origin, including repeated ancestry-based questioning, persistent mispronunciation and mocking of Plaintiff's name, refusal to use Plaintiff's preferred name, and racially charged remarks concerning the competence and service quality of a prior African[-]American [a]ccount [e]xecutive.  This conduct was directed at Plaintiff by customer personnel and occurred repeatedly over a period of months at multiple customer sites to which Plaintiff was assigned.  The conduct was frequent, ongoing, and objectively offensive, and it altered the terms and conditions of Plaintiff's employment by undermining Plaintiff's authority with customers, increasing hostility during required customer interactions, and interfering with Plaintiff's ability to perform assigned job duties in a safe and professional environment.

(*Id.* at 22–23, 28; *see id.* at 7 (asserting that Pierce "repeatedly asked Plaintiff[,] '[W]here are you from?', mispronounced Plaintiff's surname, and substituted alternate names despite Plaintiff requesting to be called Alex," that Pierce "addressed non-Hispanic personnel by their first names," and that alleged misconduct "occurred

weekly or biweekly for several months" on site and during telephone calls with Pierce).)  At the heart of the alleged harassment lie Pierce's repeated insults about Plaintiff and Plaintiff's African-American predecessor.  Such insults do not establish a hostile work environment.

As to Plaintiff, "simple teasing" and "offhand comments," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted), do not "rise to the level of a hostile work environment," *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 752 (11th Cir. 2017).  As to Plaintiff's predecessor, hearing offensive comments about another individual "is less severe or humiliating than being the intended target of direct harassment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1336 (11th Cir. 2023).  In general, "Title VII is not a civility code," and neither is the FCRA.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc).  "Not every offensive comment at work qualifies as a hostile work environment."  *Hall v. Haskell Co.*, No. 3:21-cv-01184-HES-LLL, 2023 WL 12167865, at *2, 2023 U.S. Dist. LEXIS 249610, at *4 (M.D. Fla. May 17, 2023); *see Hausberg v. Wilkie*, No. 8:20-cv-2300-TPB-JSS, 2021 WL 4133739, at *3, 2021 U.S. Dist. LEXIS 171918, at *7–8 (M.D. Fla. Sept. 10, 2021) ("Petty office squabbles, communication issues, and ordinary workplace tribulations are insufficient to create a hostile work environment." (quotation omitted) (citing *Mahone v. CSX Transp., Inc.*, 652 F. App'x 820, 823 (11th Cir. 2016), and *Baroudi v. Sec'y, Dep't of Veterans Affs.*, 616 F. App'x 899, 905 (11th Cir. 2015))).  Consequently, the court dismisses counts two and twelve for failure to state

a claim for relief.

Defendant asks the court to dismiss the counts without leave to amend because the counts do not plausibly plead the elements for a hostile work environment claim and seemingly also because the counts violate Federal Rule of Civil Procedure 8(a)(2)'s requirement of "a short and plain statement." (*See* Dkt. 51 at 10.) These reasons do not support denying leave to amend. *See Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008) (listing "undue delay," "bad faith," "dilatory motive," "repeated failure to cure deficiencies by amendments previously allowed," "undue prejudice" resulting from amendment, and "futility of amendment" as the six common bases for denying leave to amend). As the court does not discern a basis for denying leave to amend, it permits Plaintiff to replead counts two and twelve, if he can do so in good faith. *See Miles v. Carnival Corp.*, 767 F. Supp. 3d 1368, 1376 (S.D. Fla. 2025) (observing that district courts generally enjoy "discretion to grant leave to amend sua sponte"). If Plaintiff repleads, he shall keep in mind that the alleged unwelcome harassment based on race or national origin to which he was subjected must have been "sufficiently severe or pervasive to alter the terms and conditions of [his] employment and create a discriminatorily abusive working environment" for him. *See Mukhina v. Walmart, Inc.*, 162 F.4th 1128, 1133 (11th Cir. 2025) (quotation omitted).

## B. Count Five

Count five alleges that Defendant retaliated against Plaintiff for activity protected under the ADA. (Dkt. 43 at 24.) An ADA retaliation claim has three elements: "(1) statutorily protected expression[,] (2) adverse employment action[,] and

(3) a causal link between the protected expression and the adverse action." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997). Defendant maintains that count five insufficiently alleges the second and third elements. (Dkt. 51 at 10–13.)

Count five states that "Plaintiff engaged in protected activity by requesting accommodations and opposing disability-related practices," that Defendant "increased performance scrutiny and imposed disciplinary action" after Plaintiff requested disability accommodations, and that Defendant "terminated Plaintiff on May 25, 2023, shortly after Plaintiff engaged in protected activity." (Dkt. 43 at 24.) By themselves, these statements are conclusory, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Edwards v. Prime Inc.*, 602 F.3d 1276, 1301 (11th Cir. 2010). Although the count also incorporates over sixty paragraphs of factual allegations, it does not connect these facts to the elements in any way. (*See* Dkt. 43 at 24.) Given that "district courts are flatly forbidden from scouring . . . complaints to craft a potentially viable claim for a plaintiff," *Barmapov v. Amuial*, 986 F.3d 1321, 1328 (11th Cir. 2021) (Tjoflat, J., concurring), the lack of connection between count five and the facts that the count incorporates raises a serious pleading concern, *see Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279–80 (11th Cir. 2006) ("The central problem is that the factual particularity of the first 175 paragraphs is not connected to the otherwise generally [pleaded] claim in any meaningful way. . . . The lack of connection between the substantive count and the factual predicates is the central

problem with each of the enumerated counts in the complaint, because courts cannot perform their . . . function . . . . It is not that we know that the plaintiffs cannot state a claim but rather that we do not know whether they have. This is because the plaintiffs have not connected their facts to their claims in a manner sufficient to satisfy [the Federal Rules of Civil Procedure]." (footnote omitted)). This pleading deficiency warrants dismissal with leave to amend. *See id.* at 1280.

Defendant seeks dismissal without leave to amend due to futility. (Dkt. 51 at 12–13.) However, "[l]eave to amend would be futile if an amended [count] would still fail at the motion-to-dismiss or summary-judgment stage," *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020), and Defendant does not explain why an amended count five would still fail, (*see* Dkt. 51 at 12–13). Defendant is correct that a gap of five or six months between a requested accommodation and an alleged adverse action is insufficient to establish a causal link relying on temporal proximity alone. (*See id.* at 12.) *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (deeming a three-month gap insufficient). Nonetheless, if Plaintiff repleads, he is not required by law to rely on temporal proximity alone, and in any event, the court cannot accept Defendant's invitation, (*see* Dkt. 51 at 10–12), to conclude that all protected activity occurred as early as October or November 2022. (*See* Dkt. 43 at 13 (discussing Plaintiff's disability-related processing limitations in connection with his April 17, 2023 meeting with Defendant's HR representative).) Accordingly, if Plaintiff can do so in good faith, he may replead count five to allege with greater clarity the elements of his ADA retaliation claim and to connect the facts incorporated into the count to

the elements.

### C. Counts Six and Seven

Counts six and seven concern the FMLA.  Count six alleges that Defendant interfered with the exercise of Plaintiff's FMLA rights by "discourag[ing] the use of leave," by "fail[ing] to provide required FMLA rights notices," and by "increas[ing] performance scrutiny and impos[ing] disciplinary action" as to Plaintiff after he "provided notice of circumstances qualifying [him] for FMLA medical leave."  (Dkt. 43 at 24–25.)  Count seven alleges that Defendant retaliated against Plaintiff for activity protected under the FMLA when Defendant terminated him "shortly after" he "provid[ed] notice of circumstances qualifying for leave."  (*Id.* at 25.)  Each FMLA count incorporates an allegation that "Plaintiff advised [Defendant's HR department] that he did not wish to take FMLA" leave because, as he understood matters, "taking leave would financially disadvantage him and harm his performance metrics."  (*Id.* at 13, 24–25.)  A plaintiff advancing an FMLA interference claim must satisfy two elements: (1) the plaintiff was entitled to an FMLA benefit and (2) the defendant denied the plaintiff the benefit.  *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021).  Satisfying the first element requires "demonstrat[ing] that [the plaintiff] sought leave for a qualifying reason and that [the plaintiff] provided notice meeting certain criteria."  *Id.* at 1242.  An FMLA retaliation claim, like an ADA retaliation claim, has three elements: (1) the plaintiff "engaged in statutorily protected conduct," (2) the plaintiff "suffered an adverse employment action," and (3) "a causal connection exists between the two."  *Batson v. Salvation Army*, 897 F.3d 1320, 1328–29

(11th Cir. 2018). Defendant argues that Plaintiff's FMLA counts fail because they admit that Plaintiff informed Defendant that he did not want to take FMLA leave. (Dkt. 51 at 13–14.) In Defendant's view, this admission means that Plaintiff cannot establish entitlement to an FMLA benefit for count six or conduct protected under the FMLA for count seven. (*Id.*)

To prevail on either an interference claim or a retaliation claim under the FMLA, "employees must show [that] they gave 'appropriate notice'" to their employer. *Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 681 (11th Cir. 2018) (quoting *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1167 (11th Cir. 2014)). "[The] employee's notice of [the] need for FMLA leave must satisfy two criteria—timing and content—both of which differ depending on whether the need for leave is foreseeable or unforeseeable." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1195 (11th Cir. 2015). "As a general rule, [the] employee need not explicitly mention the FMLA when giving notice to [the] employer." *Id.* at 1196. However, "the FMLA and its regulations do require that the notice convey certain information," and "[a]gain, the content requirement differs depending on whether [the] employee's need for leave is foreseeable or unforeseeable." *Id.* Plaintiff does not adequately allege that he gave Defendant proper notice. (*See* Dkt. 43 at 24–25.) He does not identify whether his need for leave was foreseeable or unforeseeable and does not establish that his notice to Defendant met the timing and content requirements imposed by the FMLA and its implementing regulations. (*See id.*) Therefore, the FMLA counts fail to state claims for relief. *See Hernandez v. Vecellio Mgmt. Servs. Inc.*, No. 25-81097-CV-

MIDDLEBROOKS, 2025 U.S. Dist. LEXIS 216163, at *8 (S.D. Fla. Oct. 31, 2025) ("Without alleging sufficient notice, [the p]laintiff cannot sustain a valid claim for FMLA interference or retaliation."); *Diaz v. Robert L. Lipton, Inc.*, No. 0:24-cv-61577, 2024 WL 6963304, at *5, 2024 U.S. Dist. LEXIS 251657, at *15 (S.D. Fla. Dec. 20, 2024) ("Without sufficient notice, [the d]efendant had no duty to ascertain whether [the p]laintiff, in fact, qualified for FMLA leave." (citing *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1209 (11th Cir. 2001))); *Libreros v. Sarasota-Manatee Jewish Hous. Council, Inc.*, No. 8:23-cv-1968-CEH-LSG, 2024 WL 4933040, at *5, 2024 U.S. Dist. LEXIS 217059, at *16 (M.D. Fla. Dec. 2, 2024) ("[T]o the extent [that the p]laintiff alleges FMLA interference with his August 1 leave request, he fails to state a claim because of a lack of proper notice."); *Hill v. Mia.-Dade Cnty. Sch. Bd.*, No. 21-21980-CIV, 2021 WL 3173460, at *3, 2021 U.S. Dist. LEXIS 138380, at *10 (S.D. Fla. July 26, 2021) (concluding that "FMLA interference and retaliation claims require[d] dismissal" because "allegations [we]re insufficient to satisfy the FMLA's notice requirement[s]").

Although Defendant requests the denial of leave to amend counts six and seven, Defendant does not assert any basis for the request, let alone one of the six bases that courts commonly recognize for denying leave to amend. *See Reese*, 527 F.3d at 1263. (*See* Dkt. 51 at 14.) Defendant's position on this issue is accordingly unpersuasive. *See United States v. Holley*, 166 F.4th 139, 151 (11th Cir. 2026) (requiring arguments "to be raised *and developed*"); *United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (explaining that a party forfeits a position when the party "cites no legal authority to

- 25 -

support" the position).  In light of the allegation that Plaintiff informed Defendant that he did not want to take FMLA leave, amendment may well be futile as to the FMLA counts.  *See L.S.*, 982 F.3d at 1332.  However, given the liberal federal policy in favor of amending pleadings, and considering Plaintiff's pro se status, the court affords Plaintiff an opportunity to replead the counts, if he can do so in good faith.  *See Woldeab v. Dekalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) ("A district court's discretion to deny leave to amend a complaint is severely restricted by [Federal Rule of Civil Procedure] 15, which stresses that courts should freely give leave to amend when justice so requires." (quotations omitted)); *Brown v. Gen. Pers. Consultants, Inc.*, No. 99-2686-CIV-T-17C, 2000 WL 782084, at *1, 2000 U.S. Dist. LEXIS 8496, at *3 (M.D. Fla. Apr. 6, 2000) ("The standard for allowing leave to amend the complaint must be applied liberally, especially in this case.  [The p]laintiff is proceeding pro se with his claim; thus, he is held to a less demanding pleading standard than a lawyer."). Any amended FMLA count shall explain how Plaintiff provided Defendant with notice in compliance with the FMLA and its regulations, particularly the timing and content requirements for the notice.  *See White*, 789 F.3d at 1195–96.

### D. Count Nine

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, count nine seeks a declaratory judgment that the non-competition agreement between the parties is unenforceable under section 542.335 of the Florida Statutes, governing restrictive covenants.  (Dkt. 43 at 26.)  Count nine states that an "actual and justifiable controversy exists" as to the agreement's enforceability because "Defendant has

asserted and maintained that the agreement is valid and enforceable and restricts Plaintiff's ability to seek employment in the industrial distribution sector following [his] termination." (*Id.*)  The count also states that the "controversy is ripe because Defendant reaffirmed the enforceability of the agreement at termination, and Plaintiff has since experienced a present and continuing chilling effect on job search efforts, employment negotiations, and acceptance of comparable positions due to the asserted restriction." (*Id.*)

The non-competition agreement is not attached to the second amended complaint.  (*See id. passim*; *see also* Dkt. 43-1.)  However, Defendant has attached the agreement to the motion to dismiss, (*see* Dkt. 51-1), and asks the court to consider it as incorporated by reference into the pleading, (*see* Dkt. 51 at 16–17).  Regardless of whether "a document outside the four corners of [a] complaint" is "mentioned in" or "attached to" the complaint, the court may consider the document without converting a motion to dismiss to a motion for summary judgment if the document is "central to the plaintiff's claims" and "undisputed in terms of authenticity." *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005); *see Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) ("[W]hen resolving a motion to dismiss . . . , a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged.").  Here, the agreement is properly considered because it is central to count nine, *see Batchelor v. Wright Nat'l Flood Ins. Co.*, No. 4:19-cv-10079-KMM, 2019 WL 8060184, at *1 n.3,

2019 U.S. Dist. LEXIS 141079, at *2 n.3 (S.D. Fla. Aug. 19, 2019) (deeming a contract central to a claim seeking declaratory relief as to the contract), and because Plaintiff does not dispute the agreement's authenticity, (*see* Dkt. 59 at 15).  Indeed, Plaintiff represents that he "does not dispute that the agreement . . . may be considered as a document referenced in the complaint." (*Id.*)  The court thus considers the agreement.

The non-competition agreement restricts Plaintiff from competing with Defendant "during the term of [his] employment" with Defendant and "for a period of one . . . year following cessation of [his] employment." (Dkt. 51-1 at 2.)  Based on this restriction, Defendant asks the court to dismiss count nine without leave to amend, arguing that "there is no possibility of Plaintiff suffering an injury in the future" as a result of the agreement because "the non-competition restriction has already expired." (Dkt. 51 at 17; *see* Dkt. 43 at 19 (indicating that Plaintiff's employment with Defendant ended on May 25, 2023, more than two years before the initiation of this case).)  The Declaratory Judgment Act requires "a case of actual controversy."  28 U.S.C. § 2201(a).  "In all cases arising under the Declaratory Judgment Act, the threshold question is whether a justiciable controversy exists." *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (citation and footnote omitted).  "[T]o demonstrate . . . a case or controversy that satisfies Article III's standing requirement when a plaintiff is seeking declaratory relief—as opposed to . . . damages for past harm—the plaintiff must allege facts" showing "a substantial likelihood that [the plaintiff] will suffer injury in the future." *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019) (quotation omitted).  Absent "a

reasonable expectation that the [complained-of] injury . . . will continue or . . . be repeated in the future," a plaintiff "lack[s] standing to bring an action for declaratory relief." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347–48 (11th Cir. 1999); *accord A&M*, 925 F.3d at 1211 (requiring a plaintiff seeking a declaratory judgment to "assert a reasonable expectation of future injury").

In this case, whether a controversy exists such that Plaintiff has standing to seek declaratory relief through count nine depends on Plaintiff's reinstatement. Counts one, three, four, five, eleven, and thirteen of the second amended complaint list Plaintiff's reinstatement among the relief requested for alleged Title VII, ADA, and FCRA violations. (Dkt. 43 at 22–24, 27–29.) *See* 42 U.S.C. § 2000e-5(g)(1) (authorizing a court to rectify a Title VII violation through the injunctive remedy of reinstatement); 42 U.S.C. § 12117(a) (incorporating Title VII's remedies for ADA violations in the employment context); *see also Brasington v. EMC Corp.*, 855 So. 2d 1212, 1217 (Fla. Dist. Ct. App. 2003) (finding injunctive relief available under the FCRA in light of the statute's similarities to Title VII); *but see Scott v. Walmart, Inc.*, 528 F. Supp. 3d 1267, 1276 (M.D. Fla. 2021) (observing that reinstatement is not "provided for in the [FCRA]'s text" (citing Fla. Stat. § 760.11(5))). Of these counts, Defendant challenges only count five. (*See* Dkt. 51.) Accordingly, multiple potential avenues for Plaintiff's reinstatement remain in the second amended complaint. Neither Defendant's motion nor Plaintiff's response, however, mentions reinstatement with respect to count nine. (*See* Dkts. 51, 59.) Absent reinstatement, Plaintiff lacks standing to bring the count. *See Lane v. Dep't of Def. Missile Def. Agency*, No. 5:14-cv-

02304-MHH, 2020 WL 978824, at *2–3, 2020 U.S. Dist. LEXIS 34381, at *3–4, *6 (N.D. Ala. Feb. 28, 2020) (dismissing a claim for declaratory relief based on lack of subject matter jurisdiction when the plaintiff abandoned her request for reinstatement during discovery, and reasoning: "Absent reinstatement, the [defendant] will not be in a position to violate [the plaintiff]'s rights . . . in the future.  As a result, [the plaintiff] lacks standing to pursue . . . declaratory relief . . . ."); *Wood v. Dixon*, No. 13-00278-KD-N, 2013 WL 6183143, at *4 n.8, 2013 U.S. Dist. LEXIS 167611, at *17 n.8 (S.D. Ala. Nov. 5, 2013) ("Because [the plaintiff] is no longer employed by the [defendant and] is not seeking reinstatement, . . . [the court] . . . lacks jurisdiction over her request[] for a declaratory judgment . . . ."), *report and recommendation adopted by* 2013 WL 6183143, at *1, 2013 U.S. Dist. LEXIS 167612, at *1 (S.D. Ala. Nov. 26, 2013); *Abrams v. Tisch*, No. 1:87-cv-2313-CAM, 1989 WL 125368, at *2, 1989 U.S. Dist. LEXIS 15370, at *5 (N.D. Ga. Jan. 10, 1989) ("By its terms, [section] 2201 requires that there be an actual controversy before a court can enter a declaratory judgment.  In its present posture, this suit does not constitute a case or controversy. . . . [T]he plaintiff . . . left his employment with the [defendant].  The plaintiff does not seek reinstatement.  Consequently, . . . a declaratory judgment could [not] possibly affect the plaintiff's rights.").

Although Plaintiff requests reinstatement in other counts, count nine does not allege "a reasonable expectation of future injury" based on reinstated employment with Defendant.  *See A&M*, 925 F.3d at 1211.  Rather, the count contemplates Plaintiff's future employment with another company.  (*See* Dkt. 43 at 26 (discussing

"Plaintiff's ability to seek employment in the industrial distribution section following termination," as well as "job search efforts, employment negotiations, and acceptance of comparable positions").) Count nine, as pleaded, thus fails because Plaintiff lacks standing to pursue declaratory relief regarding his expired non-competition agreement with Defendant. That said, the agreement restricts competition during Plaintiff's employment with Defendant and for one year thereafter, (Dkt. 51-1 at 2), and if Plaintiff is reinstated, the agreement's enforceability may present a justiciable controversy. *See Wood v. Dixon*, No. 13-00278-KD-N, 2014 WL 1356234, at *1–4, 2014 U.S. Dist. LEXIS 47441, at *3, *5–6, *9, *12–13 (S.D. Ala. Mar. 17, 2014) (finding subject matter jurisdiction after the plaintiff amended her complaint to seek declaratory relief relating to her reinstatement), *report and recommendation adopted by* 2014 WL 1356234, at *1, 2014 U.S. Dist. LEXIS 47445, at *1 (S.D. Ala. Apr. 7, 2014). The court therefore declines Defendant's request to dismiss count nine without leave to amend based on the futility of amendment, (Dkt. 51 at 17), and instead agrees with Plaintiff that "if the [c]ourt concludes that [the count] requires more definite allegations of present controversy or continuing injury, the proper remedy is dismissal . . . with leave to amend," (Dkt. 59 at 17). This outcome is appropriate due to the federal policy favoring liberal amendment and due to Plaintiff's pro se status. *See Woldeab*, 885 F.3d at 1291; *Brown*, 2000 WL 782084, at *1, 2000 U.S. Dist. LEXIS 8496, at *3.

Accordingly, with regard to count nine, the court grants the motion to dismiss in part and denies it in part. The court dismisses count nine on jurisdictional grounds

but allows Plaintiff to amend the count to correct the jurisdictional deficiency described above provided that he can do so in good faith.

## E. Count Ten

Like count nine, count ten seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. (Dkt. 43 at 26–27.) Specifically, count ten seeks a declaratory judgment that Defendant violated Title VII and section 1981 when Defendant relied on third-party discrimination to discipline and terminate Plaintiff. (*Id.* at 27.) In Plaintiff's words, the third-party discrimination took the form of "complaints and demands from customer personnel whom Plaintiff had previously reported for race- and ancestry-based harassment, hostile conduct, and unsafe working conditions." (*Id.*) Count ten states that an "actual and justiciable controversy exists between the parties regarding Defendant's reliance on customer hostility and discriminatory preference as a basis for discipline and termination." (*Id.*) The count further states: "Defendant's actions created uncertainty regarding Plaintiff's legal rights and Defendant's obligations under federal anti-discrimination statutes, and that uncertainty continues to affect Plaintiff's employment prospects and contractual relationships." (*Id.*) In Defendant's view, count ten fails for the same reason that count nine does: because Plaintiff "no longer works for Defendant . . . , there is no possibility of Plaintiff suffering an injury in the future." (Dkt. 51 at 17–18.) *See A&M*, 925 F.3d at 1211; *Malowney*, 193 F.3d at 1347–48.

The same analysis and outcome that apply to count nine apply to count ten. *See*

- 32 -

*Lane*, 2020 WL 978824, at *2–3, 2020 U.S. Dist. LEXIS 34381, at *3–4, *6; *Wood*, 2013 WL 6183143, at *4 n.8, 2013 U.S. Dist. LEXIS 167611, at *17 n.8; *Abrams*, 1989 WL 125368, at *2, 1989 U.S. Dist. LEXIS 15370, at *5; *see also Wood*, 2014 WL 1356234, at *1–4, 2014 U.S. Dist. LEXIS 47441, at *3, *5–6, *9, *12–13. Although Plaintiff does not presently work for Defendant, he seeks reinstatement, (*see* Dkt. 43 at 22–24, 27–29), and although count ten, as pleaded, does not contemplate Plaintiff's reinstated employment with Defendant, the court does not deny Plaintiff leave to amend based on futility, *see Woldeab*, 885 F.3d at 1291; *Brown*, 2000 WL 782084, at *1, 2000 U.S. Dist. LEXIS 8496, at *3. Consequently, the court dismisses count ten on jurisdictional grounds but permits Plaintiff to replead to correct the jurisdictional deficiency provided that he can do so in good faith.

## CONCLUSION

Accordingly:

1. Defendant's motion to dismiss (Dkt. 51) is **GRANTED in part and DENIED in part** as explained in this order.

2. The challenged counts, i.e., counts two, five, six, seven, nine, ten, and twelve in the second amended complaint, (*see* Dkt. 43), are **DISMISSED without prejudice**.

3. If Plaintiff can do so in good faith, he may file a third amended complaint aimed at remedying the deficiencies identified in this order. Plaintiff's deadline for filing a third amended complaint is July 29, 2026. The court shall deem

abandoned any of the challenged counts that do not appear in a third amended complaint filed by this deadline. Defendant's deadline for responding to the unchallenged counts in the second amended complaint is July 30, 2026.

4. The court advises the parties that an amended pleading entirely supersedes a previous pleading. *See TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1327 (11th Cir. 2020).

5. If Plaintiff files a third amended complaint, he shall comply with all of the following directives:

   a. Plaintiff may choose not to bring any or all of the challenged counts in the third amended complaint, or he may choose to bring them all, if he can do so in good faith after he corrects the deficiencies identified in this order. The third amended complaint should also contain all unchallenged counts asserted in the second amended complaint that Plaintiff still wishes to pursue in this case. *See id.* However, because the deadline for amending the pleadings in this case expired months ago, (*see* Dkt. 54 at 1), Plaintiff shall not assert new claims in the third amended complaint, unless he first satisfies Federal Rule of Civil Procedure 16(b)(4) by demonstrating "good cause" and obtaining "the [court]'s consent," Fed. R. Civ. P. 16(b)(4), through a motion that complies with all applicable rules of federal procedure, including the Middle District of Florida Local Rules.

   b. The third amended complaint shall fully adhere to the typography

- 34 -

requirements set out in Local Rule 1.08(a). The Local Rules are available at the court's https://www.flmd.uscourts.gov/sites/flmd/files/flmd-amended-local-rules-effective-november-01-2025.pdf webpage. Plaintiff shall comply with all applicable Local Rules in this case.

c. For each challenged count, Plaintiff shall ensure that the count alleges not only the elements but also factual allegations supporting the elements and that the count clearly connects the elements and the facts.

d. If the third amended complaint brings a claim without correcting all deficiencies identified in this order related to that claim or if the third amended complaint fails to comply with any of these directives, the court may dismiss the third amended complaint without notice to Plaintiff.

ORDERED in Orlando, Florida, on July 13, 2026.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties